UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-10129-CIV-KING

HEMISPHERX BIOPHARMA, INC.,
a Delaware corporation,

    Plaintiff,

v.

BIOCLONES (PROPRIETARY) LIMITED,
a South African corporation, JOHANNESBURG
CONSOLIDATED INVESTMENTS, a South African
corporation, CYRIL DONNINGER, R.B. KEBBLE,
H.C. BUITENDAG, BART GOEMAERE and
JOHN DOE(S)

    Defendants.
_____/

## FINAL DEFAULT JUDGMENT

### I. Procedural History

Plaintiff Hemispherx Biopharma, Inc. ("Hemispherx") filed this action before the Court on December 21, 2004. [Docket Entry #1]. Defendants Johannesburg Consolidated Investments Limited, also known as JCI, Ltd., a public company incorporated under the laws of South Africa (registration number 1894/000854/06) whose shares are listed on the Johannesburg Stock Exchange, (hereinafter "JCI, Ltd."), the Estate of R.B. Kebble (hereinafter "Kebble")[1] and H.C. Buitendag (hereinafter "Buitendag") (collectively "the JCI Defendants") were served with process, and their counsel filed their appearance before this Court on January 18, 2005. [Docket Entry #18].

On March 9, 2005, Hemispherx filed its Amended Complaint, asserting claims against the JCI Defendants under the federal securities laws (specifically, Sections 13(d) and 14(e) of the

---

[1] The Estate of R.B. Kebble was substituted as a defendant in this action following Mr. Kebble's death.

Securities Exchange Act of 1934) and the common law (specifically, fraud). [Docket Entry #29]. On March 28, 2009, the JCI Defendants filed a motion to dismiss the Amended Complaint asserting that the allegations against them failed to state causes of action and asserting the Court lacked jurisdiction over the JCI Defendants. [Docket Entry #30]. On July 8, 2005, this Court granted the JCI Defendants' motion to dismiss the Amended Complaint on the grounds that the Amended Complaint failed to state causes of action against the JCI Defendants. [Docket Entry #54] The Court's July 8, 2005 Order did not address the question of jurisdiction over the JCI Defendants.

Hemispherx appealed the Court's dismissal of the Amended Complaint. On February 2, 2009, the mandate issued from the United States Court of Appeals for the Eleventh Circuit affirming the dismissal of the claims arising under the federal securities laws, and reversing the dismissal of the fraud claim. [Docket Entry # 68]. After remand to this Court, on March 2, 2009 the JCI Defendants filed a motion to dismiss for lack of jurisdiction. [Docket Entry #71]. On August 25, 2009, the Court granted the JCI Defendants' motion to dismiss with leave for Hemispherx to file an amended complaint. [Docket Entry #99]

On October 14, 2009, Hemispherx filed its Second Amended Complaint, asserting only a claim of common law fraud against the JCI Defendants. [Docket Entry #102]. The gravamen of Hemispherx's allegations were that the JCI Defendants fraudulently obtained confidential and proprietary information from Hemispherx as part of a concerted effort to devalue Hemispherx's share price and gain control of Hemispherx.

On November 20, 2009, the JCI Defendants moved to dismiss the Second Amended Complaint for failure to state a cause of action and for lack of jurisdiction over the JCI Defendants. [Docket Entry #108]

In support of their argument regarding the lack of jurisdiction, the JCI Defendants relied on previously submitted sworn declarations from: R.B. Kebble [Docket Entry #74-6]; Buitendag [Docket Entry #74-5]; Peter Henry Gray, JCI, Ltd.'s Chief Executive [Docket Entry #72]; and Christo Sutherland, JCI, Ltd.'s Group Legal Adviser (i.e., in-house general counsel). [Docket Entry #83]. In response, and in support of its argument that jurisdiction was properly exercised over the JCI Defendants, Hemispherx submitted the sworn declaration of Dr. William Carter, Hemispherx's Chief Executive Officer. [D.E. 115, Exhibit 1].

On April 7, 2010, this Court entered its Order denying the JCI Defendants' motion to dismiss, concluding that the Court could exercise jurisdiction over the JCI Defendants and that Hemispherx had adequately stated a cause of action for fraud against the JCI Defendants. [Docket Entry #121]. As to the question of jurisdiction, the Court stated:

> **A. Personal Jurisdiction**
>
> Defendants claim that Plaintiff cannot establish personal jurisdiction over Defendants in the Southern District of Florida. The Court undertakes a two-part inquiry to determine whether the exercise of personal jurisdiction over a non-resident defendant is proper in Florida. See *Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.*, 421 F.3d 1162, 1166 (11th Cir. 2005). First, the Court determines whether the exercise of jurisdiction is appropriate under Florida's long-arm statute. *Id.* "Second, [the Court] examine[s] whether the exercise of personal jurisdiction over the defendant would violate the Due Process Claus of the Fourteenth Amendment to the United States Constitution, which requires that the defendant have minimum contacts with the forum state and that the exercise of jurisdiction over the defendant does not offend 'traditional notions of fair play and substantial justice.'" *Horizon*, 421 F.3d at 1166 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).
> First the Court considers whether Florida's long arm statute provides the Court with personal jurisdiction over the Defendants. Florida's long arm statute grants a court both general and specific jurisdiction. *PVC Windoors, Inc. v. Babbitbay Beach Const., N.V.*, 2010 WL 743730, at *4 (11th Cir. March 5, 2010). In the instant action, Plaintiff contends the Court has specific jurisdiction over Defendants. "Specific jurisdiction refers to jurisdiction over causes of action arising from oir related to a defendant's actions within the forum." *Id.* (quotations omitted). The Florida long arm statute allows the exercise of jurisdiction over a nonresident defendant who personally or through an agent carries on business in the forum state or commits a tort in the forum state. Fla. Stat. § 48.193(1)(a) and (b) (1995). Committing a tortious act in Florida "can occur through a

3

nonresident defendant's telephonic, electronic, or written communications into Florida, as long as the plaintiff's cause of action arises from the communications." *Wendt v. Horowitz*, 822 So.2d 1252, 1260 (Fla. 2002). A court similarly has jurisdiction over a non-resident defendant who commits a tortious act outside of the forum state that causes injury inside the state. *See Whitney Info. Network, Inc. v. Xcentric Ventures*, LLC, 199 Fed. Appx. 738, 741 (11th Cir. 2006).

Plaintiff alleges the following basis for jurisdiction under the long arm statute in the Second Amended Complaint: In 2002 HemispheRx hosted a strategic retreat in Tavernier, Florida that consisted of meetings to discuss how Bioclones (Proprietary) Limited ("Bioclones") and HemispheRx could work together. (Second Am. Compl. At 6) Three representatives of Bioclones and JCI attended the meetings in person and Defendants Kebble and Buitendag telephonically participated in many of the meetings. (*Id.*) Further, Kebble "made it clear" that the three Bioclones representatives had authority to speak for Bioclones, JCI, Kebble and Buitendag. (*Id.*) During these Florida meetings, the Bioclones/JCI representatives and Kebble made numerous material misrepresentations to Plaintiff. (*Id.* at 6-7) These misrepresentations led to Plaintiff's exposure of confidential and proprietary information and the ensuing injuries. (*Id.* at 8.) After reviewing the Second Amended Complaint, the Court finds that Plaintiff has sufficiently alleged jurisdiction over all Defendants under Florida's Long Arm Statute.[2]

Second, the Court must determine whether the exercise of personal jurisdiction over Defendants comports with the Due Process Clause of the Fourteenth Amendment, which requires that defendants have minimum contacts with the forum state and that the exercise of jurisdiction over defendants does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316; *see also PVC Windoors*, 2010 WL 743730 at *4. "The Constitution prohibits the exercise of personal jurisdiction over a nonresident unless his contacts with the state is such that he has 'fair warning' that he may be subject to suit there." *PVC Windoors*, 2010 WL 743730 at *6. Courts consider three factors in determining whether a defendant has established sufficient minimum contacts with the forum state to comport with the Fourteenth Amendment's due process requirement: (1) whether the defendant has purposefully availed itself of the benefits of doing business in the forum state; (2) whether the cause of action arose out of the activities through which the defendant did so; and (3) whether the defendant could have reasonably anticipated being haled into court in the forum state. *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1250-1251 (11th Cir. 2000) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

This suit stems from the alleged misrepresentations Defendants and their agents made to Plaintiff at a retreat in Florida. Defendants, therefore, could have reasonably anticipated being sued in Florida. Defendants' alleged presence and statements made at that business meeting are enough to comport with the Fourteenth Amendment's due process requirements. The Court notes that Defendants live outside of the United States, but Defendants are a large corporation and former executives, traveling to the United

---

"[2] In their Motion to Dismiss, Defendants assert that the allegations in the Second Amended Complaint contradict the allegations in the earlier Verified Amended Complaint. The Court previously dismissed Plaintiff's Verified Amended Complaint with leave for Plaintiff to amend to *add* factual allegations. The additional allegations in the Second Amended Complaint, therefore, were made pursuant to the Court's discussions at the August 25, 2009 hearing and merely provide more details regarding Defendants' contacts with Florida."

4

> States will therefore not create an economic injustice. Further, Florida has an interest in protecting corporations that do business within the state.

April 7, 2010 Order at 4-8. The Court then directed the JCI Defendants to file an answer to the Second Amended Complaint within thirty days from the date of the Order.

On May 4, 2010, the Court granted the JCI Defendants' request for an extension of time to file their answer, and directed them to file their answer by May 27, 2010. [Docket Entry #124]

On May 27, 2010, counsel for the JCI Defendants filed a motion to withdraw as attorneys for the JCI Defendants. [Docket Entry #125] In their motion, the JCI Defendants' counsel stated that they were "not authorized by the Defendants to take further action with regard to this matter," and as a result could not continue representation in this case.

The JCI Defendants had been actively litigating this matter for five-and-a-half years. They were properly served in this action, they had appeared via counsel, and they had submitted sworn affidavits and declarations to this Court acknowledging that they were defendants in this matter. For example, in his affidavit filed with this Court, Peter Henry Grey stated "I am the Chief Executive Officer of JCI, Ltd., which is a defendant in this action." [Docket Entry #72] Similarly, in their sworn declarations submitted to this Court, Buitendag and Kebble both acknowledged that they had been named personally as defendants in this action. [Docket Entry #74-4 and 74-5]

On May 28, 2010, the Court granted the JCI Defendants' counsel's motion to withdraw, granted the JCI Defendants until June 17, 2010 to either retain new counsel or inform the Court if they were intending to proceed *pro se*, granted the JCI Defendants up through and including June 28, 2010 to file their respective answers and affirmative defenses to Plaintiff's Second Amended Complaint, and warned the JCI Defendants that failure "of the Defendants to comply

5

with the above provisions will create a presumption that the Defend(s) no longer desire to have his/its position represented in the lawsuit, and sanctions may be imposed by the Court, either on the Court's own motion or on motion of any party, including the entry of default against such Defendant(s)." [Docket Entry #126]. This Court's May 28, 2010 Order was served on the JCI Defendants via their counsel.

The JCI Defendants did not comply with either the deadline to retain new counsel or the deadline to file their answers to the Second Amended Complaint. On June 30, 2010, the Court ordered entry of Default Judgment against the JCI Defendants. [Docket Entry # 127]. The Default was also served on the JCI Defendants via their former counsel.

On July 23, 2010, Hemispherx filed its Motion for Entry of Final Default Judgment, pursuant to Federal Rules of Civil Procedure 54, 55 and 58. [Docket Entry # 130]. That Motion seeks compensatory damages resulting from the JCI Defendants' tortious activities directed against Hemispherx as set forth in the Second Amended Complaint. Hemispherx's Motion does not seek imposition of punitive damages against the JCI Defendants. The Motion for Entry of Final Default Judgment was served on the JCI Defendants, via their former counsel.

On July 25, 2010, the Court issued its Order Setting Evidentiary Hearing on Unliquidated Damages for August 3, 2010. [Docket Entry #132]. The Order was served on the JCI Defendants via their former counsel.

On July 27, 2010, Hemispherx served each of the JCI Defendants personally in South Africa with copies of the Motion for Entry of Final Default Judgment and the Order Setting Evidentiary Hearing on Unliquidated Damages. On July 30, 2010, Hemispherx filed a Notice Regarding Service, [Docket Entry # 133], attaching affidavits from employees of Hemispherx's South African counsel attesting that service was made on each of the JCI Defendants personally.

Also attached to those affidavits were signed service sheets showing receipt by each of the JCI Defendants.

On August 3, 2010, the Court conducted an evidentiary hearing to determine the amount of compensatory damages suffered by Hemispherx. Prior to the hearing, neither the Court nor Hemispherx received any formal or informal communication from the JCI Defendants or their counsel. The JCI Defendants did not appear at the August 3, 2010 hearing, nor did the JCI Defendants file anything with the Court.

At the August 3, 2010 hearing, the Court heard from Hemispherx's counsel and also took the sworn testimony of Charles Bernhardt and Stewart L. Appelrouth. Both Mr. Bernhardt and Mr. Appelrouth previously had submitted sworn declarations as exhibits to Hemispherx's Motion for Entry of Final Default Judgment, and their declarations and live testimony at the August 3, 2010 hearing provided the evidentiary basis in support of Hemispherx's damages calculations.

The Court now determines the amount of Hemispherx's damages and enters final default judgment against them.

## II. Determination of Hemispherx's Damages

In its Motion for Entry of Final Default Judgment, Hemispherx supported its claim for compensatory damages against the JCI Defendants with the sworn declarations of Charles Bernhardt and Stewart L. Appelrouth. Each declaration addressed a different component of compensatory damages suffered by Hemispherx as a result of the JCI Defendants' tortious activities directed against the company. In addition, at the August 3, 2010 evidentiary hearing, both Mr. Bernhardt and Mr. Appelrouth testified under oath before the Court. The testimony provided by these witnesses at the August 3 hearing was consistent with the testimony provided in their sworn declarations.

As an initial matter, the Court finds Messrs. Bernhardt and Appelrouth to be credible witnesses, and further finds that their declarations and testimony are supported by competent substantial evidence sufficient for the Court to determine the amount of compensatory damages suffered by Hemispherx as a result of the JCI Defendants' actions. The Court further finds that the declarations and testimony set forth accurate calculations of the compensatory damages suffered by Hemispherx, and that Hemispherx has met its burden of proof of proving the amount of compensatory damages it suffered as a result of the JCI Defendants' actions.

(a) <u>Bernhardt Declaration and Testimony</u>

Mr. Bernhardt is Hemispherx's Chief Financial Officer. He is a Certified Public Accountant and, in addition to his undergraduate degree in accounting, holds a Master of Business Administration.

In his declaration and testimony, Mr. Bernhardt set forth the amount of due diligence and investigative expenses incurred by Hemispherx in order to fend off the JCI Defendants' attempt to gain control of Hemispherx. Mr. Bernhardt's declaration and testimony established the amount of these damages to be $175,500.00. As set forth in Mr. Bernhardt's declaration and testimony, that amount is for expenses incurred through December, 2004 (*i.e.*, the date when this lawsuit was filed) and that amount excludes the attorneys' fees incurred by Hemispherx in the prosecution of this case. The Court finds that the expenses set forth in Mr. Bernhardt's declaration and testimony are recoverable as damages in this matter, and that the evidence provided in his declaration and testimony supports the amount set forth therein. The Court therefore finds that the amount of damages for this category of damages is $175,500.00.

(b) <u>Appelrouth Declaration and Testimony</u>

Mr. Appelrouth is an expert retained by Hemispherx to calculate other compensatory damages, in the form of the loss in value of Hemispherx's stock price, caused by the JCI Defendants' attempts to gain control of Hemispherx. Mr. Appelrouth is a Certified Public Accountant, a Certified Forensic Accountant and Fellow of the American Board of Forensic Accounting, a Certified Fraud Examiner, a Certified Valuation by the National Association of Certified Valuation Analysts, and he is accredited in Business Valuation by the American Institute of Certified Public Accountants.

Mr. Appelrouth's damages calculation spans the period of May 1, 2000 (*i.e.*, when Hemispherx was introduced to the JCI Defendants and their tortious activity against Hemispherx began) through December, 2004 (*i.e.* the filing of this action).

As part of this analysis, Mr. Appelrouth quantified the amount by which Hemispherx's common stock price was artificially depressed during this period by calculating what Hemispherx's common stock price would have traded at during this period (based on its correlation to the NASDAQ and the AMEX Biotechnology Indices, which combined encompass approximately 150 publicly traded biotechnology companies), and then computing the difference between that price and the price that Hemispherx's stock actually was trading at during the same period. Mr. Appelrouth denominated this difference as the "Adjusted Stock Price," and it is set forth in the exhibits attached to his declaration and entered as exhibits during his testimony. The Court finds this to be an appropriate method for calculating and quantifying this form of compensatory damages.

Mr. Appelrouth's analysis identified two ways that the devaluation of Hemispherx's share price caused economic damage to Hemispherx. First, Hemispherx, like other biotechnology companies, relies heavily on the regular sale of its common stock to fund its

operations. The only shares available for sale are those shares that have been previously authorized by the shareholders but not yet issued ("authorized but unissued shares") and those shares that have been repurchased by the company. Based on Mr. Appelrouth's analysis, Hemispherx was unable to take advantage of the sale of its authorized but unissued shares in order to finance its operations and instead had to rely on other, more costly means. Mr. Appelrouth calculated the resulting economic damages to Hemispherx, based on the average of the difference between the Adjusted Stock Price and the Actual Stock Price during the relevant period multiplied by the average of the authorized but unissued shares. The amount calculated by Mr. Appelrouth for this category of damages is $77,578,537.00. The Court finds this to be a reasonable method for calculating economic damages in this context and that Mr. Appelrouth's calculations are supported by substantial competent evidence. The Court therefore finds that the amount of damages for this category of damages is $77,578,537.00.

The second way that that the devaluation of Hemispherx's share price caused economic damage to Hemispherx was that it forced Hemispherx to resort to other, more costly means of obtaining finance because it was not possible to sell its common stock to do so. In order to attract investors and raise the money to fund its operations, Hemispherx had to offer convertible debt securities and pledge its assets to secure those loans. Hemispherx completed four convertible debt offerings in March, July and October of 2003 and another in January 2004 for a total of $15.57 million, and Hemispherx also issued approximately 2.5 million shares of warrants. The Court finds that the additional costs associated with this form of financing to be an appropriately recoverable form of economic damages suffered by Hemispherx as a result of the JCI Defendants tortious activities directed against the company.

In calculating these economic damages, Mr. Appelrouth identified a number of components of the additional costs associated with this form of financing: (1) interest had to be paid by Hemispherx on the debentures; and (2) significant number of warrants had to be provided by Hemispherx, in addition to convertible debt, and the price at which investors could demand Hemispherx convert those instruments into common stock was based on the artificially low market price of Hemispherx's common stock at the time.

Turning to each component, Mr. Appelrouth calculated the interest on the debt that would not have been needed if Hemispherx could have used common stock for financing as $637,000 based on Hemispherx's publicly filed financial statements. The Court finds this to be a reasonable method for calculating economic damages in this context and that Mr. Appelrouth's calculations are supported by substantial competent evidence. The Court therefore finds that the amount of damages for this element of damages is $637,000.00.

In terms of the damages relating to the fact that the warrants and the convertible debt could be converted at an artificially low price, Mr. Appelrouth calculated that amount as $39,298,319, based on the difference between the Adjusted Stock Price and the Actual Stock Price multiplied by the number of shares issued to investors on the warrants and the conversion of the convertible debt. The Court finds this to be a reasonable method for calculating economic damages in this context and that Mr. Appelrouth's calculations are supported by substantial competent evidence. The Court therefore finds that the amount of damages for this element of damages is $39,298,319.00.

Finally, Mr. Appelrouth also calculated the economic damages suffered by Hemispherx relating to the fact that the few shares Hemispherx was actually able to issue were issued at a diminished value as a result of the JCI Defendants' tortious activities directed at the company.

Mr. Appelrouth quantified those damages as $8,250,529.00 by multiplying the number of shares issued during the period by the difference between Hemispherx's Adjusted Stock Price and its Actual Stock Price. The Court finds this to be a reasonable method for calculating economic damages in this context and that Mr. Appelrouth's calculations are supported by substantial competent evidence. The Court therefore finds that the amount of damages for this element of damages is $8,250,529.00.

The Court therefore finds that the total economic damages suffered by Hemispherx as a result of the artificial depression of its common stock price resulting from the JCI Defendants' tortious activities directed against the company from May 2000 through December 2004 is $125,764,385.00.

(c) Total Damages

Hemispherx's damages, exclusive of prejudgment interest, as a result of the JCI Defendants' misconduct are $125,939,885.00, *i.e.*, the sum of $125,764,385.00 and $175,500.00.

Prejudgment interest as calculated through July 22, 2010 is $62,138,394.00 and it will continue to accrue at the rate of 6% (*i.e.*, $20,702.00 *per diem*) up through entry of this Final Default Judgment.

The Court therefore determines and finds that Hemispherx's total damages are $188,078,279.00 (*i.e.*, the sum of $125,939,885.00 and $62,138,394.00) plus $ 414,040.00 (*i.e.*, the amount of prejudgment interest that has accrued at a *per diem* rate of $20,702.00 from July 23, 2010 through today's entry of this Final Default Judgment), for a total amount of $188,492,319.00. It is therefore,

**ORDERED and ADJUDGED** as follows:

CASE NO. 04-10129-CIV-KING

That Plaintiff Hemispherx Biopharma, Inc. recover of the Defendants JCI, Ltd., the Estate of R.B. Kebble, and H.C. Buitendag the sum of $188,492,319.00, with interest thereon provided by law from the date of this judgment, and its costs of action.

**DONE and ORDERED** in chambers at the James Lawrence King Federal Justice Building and United States Courthouse, Miami, Florida, this 11th day of August, 2010.

*[Signature]*
JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE

Copies provided to counsel of record